STEPHEN J. WINDHORST, Judge.
j 2Pefendant, Leslie Reed, was convicted of second degree murder in violation of La. R.S. 14.30.1. After denial of his motion for post-judgment verdict of acquittal and his motion for new trial,[1] defendant was sentenced to life in prison at hard labor without the benefit of probation, parole, or suspension of sentence. In this appeal, we affirm defendant’s conviction and sentence.
FACTS
On May 29, 2012, Jared Mealey was shot and killed in the Preston Hollow neighborhood of St. Rose, Louisiana. The following facts were adduced at trial."
In the evening, hours of May 29, 2012, defendant (known as “Rolla”) and Keywine Bradford (known as “Poppa”) went to see Anthony Randle at. his grandmother’s house. Defendant, Bradford, Randle, and Randle’s cousin, Mike McCray talked for some time and “caught up” with each other. The group decided to go to the party being held down the street. As they were walking down Turtle Creek Road, the victim, Jared Mealey, drove past them. Bradford testified that when -Mealey saw the group he sped up. At trial,- Bradford *208 recalled that Randle»said something about Mealey looking “scary,” meaning “afraid.” Mealey had previously been a part of the group, and he and defendant had been really good |sfriends, however, there had been a problem between Mealey and defendant concerning drugs, and Mealey had not “hung out” for weeks.[2]
After Mealey drove past.them,' defendant motioned for Bradford to follow him, while Randle walked a few steps ahead of them. The two men walked towards the railroad tracks, in the opposite direction of Randle. They turned the corner, and defendant told Bradford that it was “the perfect time to commit the murder.” Defendant handed the gun to Bradford, but before the two m,en got to Turtle Creek Road, Bradford handed the gun back to defendant because he.“could not do it.” Defendant instructed Bradford to flag Mealey down.
Bradford flagged Mealey down and called for him saying “yo.” Mealey put the car in reverse and.rolled down his window so that they could talk. While Bradford was talking to Mealey, Mealey did not look at him. Bradford testified that he could tell Mealey was on drugs. Mealey told Bradford that he was going to watch a sporting event,’ and he asked Bradford if he wanted to “smoke' crack” and “get loaded,” to which Bradford replied he did not “do crack.”
Bradford saw defendant walk up to the car out of his peripheral vision, so he backed up. . Defendant stood at the driver’s side window and fired six shots into the car.
At trial, Bradford testified that he had been with the defendant, the previous evening when defendant acquired a “nine millimeter” gun with “Millennium” written on it from Bradley Price. Bradford testified that the gun defendant used to shoot Mea-ley was the same gun that defendant acquired from Price. Bradford had kept the gun the previous evening, and returned it to defendant on the day of the shooting. Bradford further testified that he knew when he flagged the car down Uthat Mea-ley was going to be murdered, and he did it to show defendant his loyalty and to impress him. .
After defendant shot Mealey, he and Bradford walked back the way they had come, to meet up with Randle. When they caught up with Randle, they all went to a party down the street. According to Bradford, they tried to act as if nothing had happened and blend in with everyone else. People asked them if they had heard the gunshots, and they responded that they had not heard them. Randle told them he saw police in the neighborhood soon after he heard the shots.
Defendant and Bradford continued walking and went to the ■ fence of Bradley Price’s home. Defendant handed the gun he had used to shoot Mealey to Mr. Price over the fence. While talking to Mr. Price, defendant said, . “f* * * Mealey,” and said he killed Mealey by saying, “I smoked him.”
While defendant and Bradford were on their way home, they saw Mealey’s headlights shining down the street. Defendant stopped in the middle of the road and said “look at my work” in reference to the headlights. The .two then went home. Walking quickly, it took about seven minutes to get from where the shooting occurred to Bradford’s house.
*209 Deputy David Jones of the St. Charles Parish Sheriffs Office was dispatched- to the 600 block of Turtle Creek Road concerning shots fired and a car parked in front of a house. He was the first officer present .on the scene. Deputy Jones observed a ear backed up into a fire hydrant. He approached the car and noticed that the rear driver’s door window was shatr tered. As he got closer, he saw the victim “slumped back” in his seat covered in blood. Deputy Jones observed that the car was still running and was in reverse. Upon arrival, the coroner, Dr. Brian Bro-gle, classified Healey’s death as a homicide. Evidence collected at the | ¿scene included four Winchester Luger 9 mm casings, one RP Luger 9 mm casing, and one CCINR Luger 9 mm casing.
Colonel Timothy Scanlan, the Laboratory Service Commander for the Jefferson Parish Sheriffs Office, was accepted at trial as an expert in the fields of firearms, tool mark examination, and crime scene reconstruction. He reviewed the photographic and firearms evidence collected from the scene and the autopsy in this case, and was able to narrow down the type of weapon used in the murder to be a 9 mm semi-automatic weapon with a circular firing pin. He stated that this assessment narrows the possible weapons tó a general class, and the Taurus Millennium falls into that general class. He also determined that all 6 casings found at' the crime scene were fired from the same weapon, which led him to the conclusion that there was orily one shooter. The casings were all 9 mm caliber, but the bullets were from multiple manufacturers. One of the casings, the CCI 9 mm casing, found on the scene was “fairly unique” in that it was an aluminum casing that cannot be reloaded. He said that the casing was marked “NR” to indicate that it was not meant to be reloaded. Colonel Scanlan stated that type of ammunition was still common, just not as common as the other types of casings found at the scene. Scan-lan also testified..that, given the gun used to commit the crime, the shooter would have had to have pulled the trigger six times in order to fire the six shots.
In addition, Colonel Scanlan analyzed the crime scene photographs, including photographs of the interior and exterior of Healey’s car. He found that the evidence at the crime scene was consistent with a shooter standing at the driver’s door, shooting into the vehicle.
Sergeant ¡ Bradley Walsh worked as a detective in the Griminal Investigations Division at the St. Charles Parish Sheriffs Office and arrived at the scene ..of the | (¡murder on May 29, 2012.- There were about 200 onlookers on the scene that night. As a result of speaking with Mea-ley’s family and Ms. Bell, Bradford’s mother, Sergeant Walsh went to speak to defendant. Sergeant Walsh testified that he arrived at defendant’s home after midnight. Defendant came out to meet him and said, “I heard /all were looking for me.” Defendant .said he had just found out about the murder and had no information other than what he had heard from around the neighborhood.
Sergeant Walsh obtained a second statement from déféndant on June 3, 2012. ' On that day, defendant was attending a can-dlelightvigil for Mealey'when someone opened fire ón defendant with an “AK 47,” so defendant went to the police. ' Defendant related that people thought he might know Something about Meale/s murder because they used to be together every day. Defendant stated they were best friends and like-brothers. Defendant told police that he stopped -hanging out -with Mealey because Mealey was using drugs, but defendant stated that they had not had an argument or falling out. He added that *210 they still talked because they- worked together. Defendant said that he was at home at the time of Mealey’s murder. He also told police he did not know Bradford’s name, but that he only knew him as “Poppa,”
Defendant went to the visitation for Mealey’s funeral on June 5, 2012. That evening, Sergeant Walsh spoke with him again, and defendant again told police that he was at home at the time of Mealey’s murder. In this statement, defendant admitted that he knew “Poppa” was Bradford. Defendant said that Bradford came over to defendant’s home and told him that he had killed Mealey, but he would not tell defendant why. Defendant stated that-he was angry because Mealey was his friend, but he did not tell anyone Bradford killed Mealey because he did not want to be a rat.
17Based upon defendant’s June 6, 2012 statement, an arrest warrant for Bradford was issued. Bradford, who was a juvenile at the time, went to the police station with his mother and uncle to turn himself in. After giving a statement, in which he did not implicate himself, Bradford was placed under arrest. Bradford was held at the station overnight because the nearest juvenile facility was in Shreveport, and Bradford was to appear in court in St. Charles Parish for his continued custody hearing the following day. Bradford stated he knew “Rolla” [defendant] had put him there. Bradford was given pen and paper to doodle while he was in his cell. While he was alone, Bradford wrote a statement in which he implicated himself and defendant in Mealey’s murder, by writing that defendant had instructed pim to flag Mea-ley down and then defendant shot Mealey.
The following day, June 7,;. 2012, the court determined that Bradford would be tried as an adult. After the hearing, Bradford made another statement with his lawyer present. -'In this statement, Bradford returned to his original -oral statement where he had not implicated himself. Bradford said that he was never at the crime scene, and that only defendant was there. At trial, Bradford testified that he did not realize that his written statement was a confession and wanted to take it back.
As a result of Bradford’s written statement, a warrant for defendant’s arrest was obtained. Additionally, officers executed a search warrant at defendant’s home on June 7, 2012. Detective Giovanni Tarullo recovered a CCI 9 mm luger live round from one of the closets in defendant’s home.' No weapon was discovered in the search. Sergeant Walsh advised defendant of his rights and informed him that he was under arrest for Mealey’s murder. Detective Walsh told defendant that the search conducted at defendant’s home had recovered a live round identical to one at the murder scene, to which defendant replied, “it was not identical.”
| «Defendant was interviewed twice on August 2, 2012. In his first statement, he denied going to Randle’s grandmother’s house on the night of the shooting; however, he admitted seeing Randle in his second statement. ■ In both statements, defendant denied seeing Bradford, and he further stated that he did not stop at the party.
Bradford went to trial and was convicted of second degree murder. In September of 2013, prior to .his trial, Bradford asserted that the written statement was coerced and had not been the truth. After the trial but before sentencing, and after being advised of his rights, Bradford gave another statement to Sergeant Walsh which was similar to his .prior written statement, implicating .defendant in Mealey’s murder. The trial court granted a motion for new trial in the interest of justice, and Brad *211 ford pled guilty to the amended charge of manslaughter in violation of La. R.S. 14:31.
During his testimony at defendant’s trial, Bradford stated that he had not been guaranteed a deal for his statement, but after the statement,, he “pled guilty to principal to manslaughter.” He further stated that he had not yet been sentenced, but he understood that that his sentence would be from ten to twenty years.
ASSIGNMENT OP ERROR
In brief, defendant phrases his sole assignment of error as follows:
The jury improperly returned a guilty verdict against Leslie Reed despite the fact that Bradford gave a confession to the police wherein he admitted to being involved in the shooting death of Jared Mealey. Bradford stated that on May 29, 2012, he was in the Preston Hollow neighborhood when he flagged down Mealey in the 600 block- of Turtle Creek [Road] as Mealey -was driving in the neighborhood. Seconds later, Mealey’s vehicle rolled backwards into a fire hydrant and he was pronounced dead on the scene. Bradford originally denied having any involvement in Mealey’s death until he realized that he was going to be prosecuted as an adult for second degree murder. At that point, he implicated Reed as the shooter and told the interrogating officer that he only flagged Mealey in order to give Reed an ^opportunity to shoot Mealey. At this point, both men implicated one another and the evidence was weighed evenly with both of them.
The district court then permitted the State to prejudiced [sic] the jury against Reed when it permitted the: State to introduce a transcribed statement from August 2nd into the record wherein the officer mentioned to Reed during the interrogation that-the entire neighborhood viewed him as a “cancer eating away at Preston Hollow”. The statement totally prejudiced the jury and cremated the perception in the jury’s mind that Bradford’s reversion [sic] of the facts were true. ■
Defendant contends that the trial court erred in allowing the jury to hear and read a portion of his August 2, 2012 statement to police where the interrogating officer stated that everyone in the neighborhood thought defendant was a “cancer eating away at Preston Hollow,” which prejudiced the jury against defendant and caused them to believe the version of events presented by his co-defendant, leading to defendant’s conviction. Defendant argues that this statement was a reference to other crimes or bad acts, and was inadmissible at trial because its prejudicial effect outweighed any probative value, pursuant to La. C.E. art. 404B.
The State argues that, defense -counsel had time to review, the statement and made no objection to its introduction. Additionally, the State contends that no added attention was brought to the statement in an attempt to prove that defendant had committed prior bad acts, but the. statement was used as. nothing more than a comment made by a police officer during a voluntary-statement by defendant. Lastly, the State asserts that vague, non-pointed statements do not constitute other crimes evidence.
Prior to trial, defense counsel filed omnibus motions including a motion to suppress all statements as taken in violation of defendant’s Fifth Amendment rights. During a bench Conference, defendant orally objected to the introduction of the statement, arguing that it was “rank hearsay,” as-it was unknown who made the comment, about defendant’s .character. Defendant did not object to the statement Jinon the grounds that it constituted inad *212 missible’ other ■ crimes evidence at that bench conference, and- did not. object to that portion of the statement during trial. Defendant also did not raise this issue in his motion for new trial or. his motion for post-judgment verdict of acquittal.
To preserve the right to appellate review of an alleged trial court error, a party must state a contemporaneous objection with the occurrence of the alleged error as well as the grounds for the objection. State v. Richoux, 11-1112 (La.App. 5 Cir. 9/11/12), 101 So.3d 483, 490. A primary purpose of the contemporaneous objection rule is to bring an alleged irregularity to the attention of the' trial judge and opposing counsel, allowing the trial judge the opportunity to make the proper ruling and correct any claimed prejudice'to the defendant. State v. Lyons, 13-564 (La.App. 5 Cir. 1/31/14), 134 So.3d 36, 40. A defendant is limited to the grounds for objection that he articulated in the trial court, and a new basis for the objection may not be raised for the'firsLtime on appeal. State v. Jackson, 450 So.2d 621 (La.1984); State v. Alvarez, 10-925 (La.App. 5 Cir. 6/29/11), 71 So.3d 1079, 1085 (citing La. C.Cr.P. art. 841A); See also State v. Simmons, 13-258 (La.App. 5 Cir. 2/26/14), 136 So.3d 358, 372.
State v. Griffin, 14-450 (La.App. 5 Cir. 12/16/14), 167 So.3d 31, 43.
In this appeal, defendant raises for the first time that the statement was improperly admitted as evidence of other, crimes or bad acts in violation of La. C.E. art. 404B., Accordingly, this issue is not properly before this court on appeal.
But even if it was properly before this court, vagué, non-pointed statements, such as the one before us, do not constitute other crimes evidence. State v.Sanders, 12-114 (La.App. 5 Cir. 09/11/12), 101 So.3d 994; writ denied, 12-2153 (La.03/15/13), 109 So.3d 376; State v. Keys, 29,369 (La.App. 2 Cir. 05/07/97), 694 So.2d 1107, writ denied. 97-1387, 97-1497 (La.10/31/97), 703 So.2d 21.
• We find defendant’s sole assignment of error to be without merit.
ERRORS PATENT
The record was reviewed for errors patent, according to the mandates of La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review óf the record reveals that there are ño errors patent.
CONCLUSION
.,-For the above discussed reasons, defendant’s .conviction and sentence are affirmed.
AFFIRMED

. In his motion for new trial, defendant contends the jury verdict is contrary to the law and evidence, and that his first statement should have been suppressed. In his motion for judgment notwithstanding the verdict, defendant contends that the evidence presented was insufficient to support .the jury verdict.

. At the time of Mealey’s death, he was nineteen years old. Defendant also was nineteen years old. Bradford was sixteen years old.